IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

REGINALD THOMAS BUNN, JR.,

Petitioner,

No. 2:11-cv-1373 MCE CKD (TEMP) P

vs.

RAUL LOPEZ,

Respondent.

FINDINGS AND RECOMMENDATIONS

______________________________/

Petitioner is a state prisoner proceeding through counsel with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges a judgment of conviction entered against him on January 4, 2008 in the Sacramento County Superior Court on charges of first degree murder committed in the commission of a robbery, with an enhancement for personal discharge of a firearm causing great bodily injury or death. He seeks federal habeas relief on the following grounds: (1) the trial court violated his right to a public trial; (2) his trial counsel rendered ineffective assistance in failing to object more aggressively to the trial court's failure to open the courtroom to more spectators, failing to move to sever petitioner's trial from the trial of one of his co-defendants, and failing to object to the admission of inflammatory evidence at trial; and (3) his sentence of life without parole plus 25 years-to-life constitutes cruel and unusual punishment in light of the fact that he was a juvenile when the crime was committed.

Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

PROCEDURAL AND FACTUAL BACKGROUND

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> Reginald Thomas Bunn and Antonio Lamar Minor were convicted of first degree murder (Pen.Code, § 187, subd. (a))[1] of a marijuana dealer named Gamaliel Torres.[2] The jury found true the special circumstance that the murder was committed while Bunn and Minor were engaged in the crime of robbery or attempted robbery within the meaning of section 190.2, subdivision (a)(17). The jury found true the allegation that Bunn and Minor had each personally discharged a firearm (Bunn fired a .357-caliber handgun and Minor fired a .410-gauge shotgun) causing Torres's death within the meaning of section 12022.53, subdivision (d).
>
> Rejecting the claims of Bunn and Minor, who were each 17 years old at the time of the murder, of unconstitutional cruel and unusual punishment, the trial court declined to exercise its discretion to impose a 25-years-to-life sentence and instead sentenced both Bunn and Minor to indeterminate terms of life without the possibility of parole (LWOP) (§ 190.5, subd. (b)), plus 25 years to life for the firearm enhancement. A restitution fine of $10,000 was imposed under section 1202.4 and a parole revocation fine of the same amount was imposed and stayed under section 1202.45. No credit for time served was awarded.
>
> On appeal, Bunn claims (1) the trial court in effect closed the courtroom to some of the defendant's friends and family violating his constitutional right to a public trial; and (2) his trial counsel provided ineffective assistance by (a) failing to move for severance, and (b) by failing to object and move for exclusion of certain inflammatory bad character evidence. Both Bunn and Minor claim on appeal their LWOP sentence constitutes cruel and unusual punishment and the trial court abused its discretion in rejecting a 25-years-to-life sentence. Both assert, and the People concede, the trial court erred in denying them custody credit for

---

[1] Hereafter, undesignated statutory references are to the Penal Code.

[2] Codefendants Daryeus Howard and Justin Mylove-Smith were tried by separate juries. In a negotiated disposition after their juries were unable to reach verdicts, Mylove-Smith and Howard each pled no contest to lesser charges and were sentenced to two years in state prison.

actual time served and by imposing a parole revocation fine when they had been given a LWOP sentence. We shall accept the People's concession of the last two claims and reject all others. With the aforementioned modifications, we shall affirm the judgments.

**FACTUAL BACKGROUND**

**The Prosecution's Evidence**

On March 9, 2006, at about 10:00 p.m., George Gomez, who lived next door to the parking lot for Chorley Park, heard a male say something in an angry voice, followed by several gunshots. He heard a car rev its engine. When he peered out of his blinds, Gomez saw a dark blue small SUV exit the park. Jasmine Ramos was inside her home near Chorley Park on March 9, 2006. Around 10:00 p.m., she heard gunshots and when she looked out her window, she saw a car that looked like a Ford Explorer speed past.

A little after 10:00 p.m. that same night, Sacramento Police Officer Garrett Dutra was doing a park check at Chorley Park when he noticed a black Toyota pickup parked in the parking lot. Both doors were open and the truck engine was running. When Dutra approached the truck, he saw the driver's window was shattered, although intact, and there was a bullet hole through the window. The driver, who was later identified as 19-year-old Gamaliel Torres, was still seat belted in his seat with his hands in his lap and his head leaning down. Torres was dead from a fatal gunshot wound to the upper left side of his head behind the ear and a fatal shotgun wound to his right arm. It was later determined from stippling surrounding the head wound that the gun had been either in contact with or very close to the glass window at the time Torres was shot. The muzzle of the shotgun was within three to four feet of Torres at the time of shooting. Dutra observed a cell phone headset hanging from Torres's head with no phone attached. Dutra saw blood on the inside of the window and blood dripping from the truck onto the ground.

Torres was a known dealer of marijuana. He used little baggies printed with hearts, skulls and marijuana leaves as packaging. Torres had been wearing a chain necklace that day.

Meanwhile, less than a half mile away from Chorley Park, Sacramento Police Officer Stephen Moore had stopped a dark blue Mercury Mountaineer (SUV) for speeding. Moore approached the SUV and the driver, Mylove-Smith, provided his license and insurance. Moore smelled a strong odor of marijuana and decided to search the SUV. He called for assistance as there were four individuals in the SUV. Mylove-Smith was in the driver's seat, Howard was next to him in the front passenger seat, defendant Bunn was behind Mylove-Smith in the left rear passenger seat, and

defendant Minor was behind Howard in the right rear passenger seat. Sacramento Police Officer Brian Laird arrived to assist Moore.

Laird instructed everybody in the SUV to put their hands where the officers could see them, but Minor repeatedly dropped his hands from the back of the seat down to his seat. When the occupants of the SUV were removed, the officers discovered three sandwich-size baggies containing what appeared to be marijuana on the seat where Minor had been sitting. Laird searched Minor and found a cell phone, some change, and a .410 shotgun round in his pants pocket.

About this time, Moore heard Dutra broadcast his discovery of the body at Chorley Park. A subsequent search of the SUV uncovered a shotgun under the front passenger seat, where it would have been accessible only to Minor. The shotgun had blood on the wood part at the front. In the seat pocket in front of where Minor had been sitting, a live shotgun shell was found along with a small baggie stamped with hearts, containing some unidentified purple pills. Under the driver's seat near where Bunn's feet had been, Laird found a black .357-magnum revolver with two live rounds and one spent casing. Moore noticed blood on Bunn's hands and on the fingers of both of Minor's hands. Bunn had blood spatter on both sides of his pants, as well as on his left shoe. Later examination of the SUV disclosed blood stains in the back passenger area in eight places; seven connected with the right rear passenger area and one on the rear driver's side passenger door. DNA testing of the blood found on Minor's hand, Bunn's clothes and shoes and from the interior driver's and passenger's side rear doors of the SUV was conducted and the samples were determined to contain the same DNA profile as Torres.

The search of the SUV also revealed a Sprint cell phone and a chain necklace on the rear passenger's floorboard, where Minor had been sitting, next to a baggie of marijuana. There appeared to be blood on the phone and necklace, as well as on some of the baggies of marijuana in the SUV. A close friend of Torres identified the necklace and cell phone as Torres's phone and necklace. A shoebox in the cargo area of the SUV contained athletic shoes and about 20 small baggies of marijuana, stamped with hearts or marijuana leaves. Bunn's jacket in the rear cargo area contained marijuana packaged in a baggie with red hearts. A backpack with Howard's identification card inside was also found in the cargo area. The backpack contained a plastic baggie with 21 smaller plastic baggies inside, stamped with hearts or marijuana leaves. Beanies and a ski mask were also found inside the SUV.

Later testing showed a large amount of gunshot residue (GSR) on Torres, consistent with his having been shot twice. GSR was also found on Minor's hands, along with a large number of lead

particles, consistent with the lead shot pellets of a shotgun. GSR was found on the back of Bunn's hands, but not his palms. The People's expert opined that Minor and Bunn had either fired a weapon, were within the vicinity of a weapon when it was fired or had handled a fired weapon or fired ammunition. One particle of GSR and nine particles of lead were recovered from the rear driver side door of the SUV. Two particles of GSR and over 30 lead particles were recovered from the rear passenger side door. No GSR was detected on the front driver or front passenger side doors. Neither Mylove-Smith or Howard had any GSR on their hands.

At autopsy it was determined that the bullet components recovered from Torres's skull were from a single jacketed bullet fired from the revolver recovered from the SUV. The shotgun shell components removed during autopsy were consistent with the shells used in the shotgun found in the SUV.

Minor's MySpace page included a photograph of himself holding the revolver used in Torres's murder.

**Minor's Defense**

Minor testified in his own defense.

On the evening of March 9, Minor called Bunn to ask him for a ride to the store to buy baby formula for Minor's baby, although Minor also planned to smoke some marijuana and hang out before going home. Bunn, Mylove-Smith, and Howard picked Minor up around 8:45 or 9:00 p.m. Bunn told Minor they were going to make a stop before they took Minor to the store. Bunn asked Minor to call Torres for him, explaining that his cell phone was dead. Minor had never met Torres. Minor called Torres and arranged for them to meet Torres at Chorley Park. They drove to the park where they waited about an hour for Torres to arrive. Minor knew Bunn sold marijuana, but did not know who his supplier was.

When Torres arrived, Minor claimed that Mylove-Smith got out of the car and walked to Torres's truck. He came back after a minute and spoke to Bunn. Bunn got out of the car and both he and Mylove-Smith walked back to Torres's truck. Minor then heard three loud bangs. He looked up and saw Mylove-Smith at the passenger side of Torres's truck and Bunn at the driver's window. Bunn was looking at his own shirt. Thinking Bunn might be hurt, Minor got out of the car and ran to the truck. He saw Torres in the truck with his head leaning towards the steering wheel. Minor saw Bunn had a long black gun in his hand and Mylove-Smith was holding a shotgun. Bunn kept reaching in the truck for something. Minor bear-hugged Bunn, trying to get him to leave. Minor got blood on himself in the process. Minor, Bunn, and Mylove-Smith

ran back to their car. Bunn put his head down and said "I killed him, blood." Mylove-Smith drove away from the park.

About 30 seconds after they left the park, Minor became aware that they were being followed by a police officer. He told Mylove-Smith to slow down as he was driving too fast. Mylove-Smith then began tossing baggies of marijuana to the back seat, telling Minor to "hold this." He also slid the shotgun back to Minor, who grabbed it with both hands and slid it under the seat in front of him. Mylove-Smith tossed some shotgun shells back to Minor who put one in the seat pocket and one in his pants pocket.

Minor claimed the revolver in the MySpace photograph and the shotgun belonged to Bunn. He denied seeing any weapons until after he heard the gunshots and had no idea where they came from.

**Bunn's Defense**

Bunn testified in his own defense. He denied shooting Torres.

Bunn testified he sold marijuana in small quantities, mostly at his high school. Torres was his regular supplier and his friend. Torres had delivered two ounces of marijuana to Bunn the night of March 8, the day before the shooting. He also gave Bunn some baggies for packaging. Some of the marijuana and packages were in the shoebox found in the SUV's cargo area the next day.

On March 9, Minor called Bunn asking to buy a quarter pound of marijuana. Bunn told him he did not have that much. Minor asked Bunn to take him to "the Mexican dude" that supplied Bunn. Bunn knew Torres still had eight ounces left to sell and eventually Bunn agreed, hoping for a referral fee. Mylove-Smith, Howard, and Bunn picked Minor up and began to head in the direction of Torres's house, but Minor called Torres and arranged to meet him at Chorley Park. They arrived about 45 minutes before Torres did.

Torres arrived at the park around 10:00 p.m., pulling up behind and to the right of the SUV defendants were in. Bunn rolled down his window to greet Torres. They nodded at each other and Bunn rolled his window back up. Minor got out and went to the passenger side of Torres's truck. Minor went back and forth between the SUV and the truck several times. Mylove-Smith asked Bunn to go see what was taking so long. As Bunn approached the driver's side of the truck, he heard a loud gunshot. He saw Minor run back to the SUV and then back to the driver's side of the truck, where Minor hit the window with a revolver. As Bunn reached up to hit the gun out of Minor's hand, the gun went off.

Bunn opened the driver's door to check on Torres and saw that he was dead. Torres fell towards Bunn, who pushed him back

> upright. Bunn picked up the revolver from where it had fallen on the ground and got back in the SUV. Bunn placed the revolver on the back seat near Minor and told Minor: "You killed him." Once the police were behind them, Minor put the gun on the floorboard in front of Bunn. Bunn kicked it under the seat.
>
> Bunn denied ever seeing the revolver or shotgun before this night.

(Doc. 17-1 (hereinafter Opinion) at 1-11.)

ANALYSIS

I. Standards of Review Applicable to Habeas Corpus Claims

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the state court decision. Greene v. Fisher, ___ U.S. ___, ___, 132 S.Ct. 38, 44 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). "Circuit court precedent

may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, ___ U.S. ___, ___, 133 S.Ct. 1446, 1450 (2013) (citing Parker v. Marrhews, ___ U.S. ___, ___, 132 S.Ct. 2148, 2155 (2012)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id. Further, where courts of appeals have diverted in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 77.

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 412. See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541

U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter,562 U.S. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, ___ U.S. ___, ___, 133 S.Ct. 1088, 1091 (2013).

/////

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98.

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

II. Petitioner's Claims

A. Right to a Public Trial

Petitioner's first claim for federal habeas relief is that the trial judge violated his right to a public trial when he refused to allow more of petitioner's family members and friends to attend the trial, even though there were empty seats in the courtroom. (Doc. No. 8 (hereinafter Pet.) at 5. Petitioner raised this claim for the first time on direct appeal. The California Court of Appeal explained the background to the claim as follows:

> **Background**
>
> After the selection of the three juries impaneled for this case (one for Howard, one for Mylove-Smith and one for Bunn and Minor), counsel for Bunn pointed out that only six seats were left available for the public. Counsel stated there probably would not be enough room for "even representative family members." Recognizing the difficulties of having multiple juries, counsel felt that "we ought to open up some of the additional seats that are blocked off in here so more of the public can get in." He suggested the better solution was to get a bigger courtroom or to not do the trials all at once.
>
> The trial court noted "it's now 9:15 on the day that we are going to

> start this case, and we had known all along we were going to do this case in this courtroom. [¶] And I appreciate that there is not enough room for everybody who wants to be here. We have set aside about, I think we got at least eight seats, allowing for buffers, for members of the public who want to be here." The trial court found "we are not impacting anybody's constitutional rights to the extent it's going to require a continuance of this case, or removal of this case from this courtroom to another courtroom."
>
> Counsel for codefendant Howard then expressed the interest of the Howard family in having more than two seats for their family representatives "so that friends and the church bishop and others may come and show their support . . . ." Counsel for codefendant Mylove-Smith observed that "of the eight seats . . . available, two of them are going to be earmarked for the victim and the victim's family, so I believe that probably leaves six for the [defendants'] family." The court replied that the victim's father and someone from victim services wanted to be present "for today alone[.]" There would otherwise be eight seats available, two for each defendant.

(Opinion at 11-12.)

Petitioner states that a number of his friends and family members were unable to attend the trial, or as much of the trial as they wished to attend, because of the trial court's ruling limiting the available seats to two per defendant. (Pet. at 16.) He explains that several of his supporters tried to enter the courtroom during the trial proceedings but were turned away by the bailiff because of an ostensible lack of available seating. (Id.) He also notes that the trial court did not justify the need for a buffer zone of seats, or even explain what or whom those seats were for, and he observes that there were empty seats in the courtroom during the course of the trial. (Doc. No. 26 (Traverse) at 6.) Petitioner argues,

> The partial closure of the courtroom during the majority of the trial proceedings violated petitioner's right to a public trial. There was no state interest, compelling or otherwise, that justified keeping the entire front two rows of the courtroom empty when petitioner's friends and family members were waiting to enter the courtroom."

Pet. at 18. Petitioner points out that no federal case holds that "a trial court may block off rows of seats in the courtroom upon a defendant's objection without stating a justification for the closure, thereby preventing interested friends and family members from attending a criminal

defendant's trial." (Traverse at 9-10.) Petitioner informs that court that "more than 25 people" wanted to attend his trial. (Pet. at 5). He also notes that "no seats were made available for the press or general public." (Traverse at 6.)

The California Court of Appeal rejected these arguments, reasoning as follows:

> **Analysis**
>
> Bunn now claims on appeal that his constitutional right to a public trial was violated by the trial court's refusal to open up additional courtroom seats or to consider other alternatives that would provide more space for defendant's family, friends, and the public. The record does not support his claim.
>
> Both the United States and the California State Constitutions guarantee the right to a public trial in criminal cases. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15;[3] see People v. Woodward (1992) 4 Cal.4th 376, 382.) ""'The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions . . . ."' [Citation.] 'In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury.' [Citations.]" (People v. Esquibel (2008) 166 Cal.App.4th 539, 551.) Violation of the right to a public trial requires reversal of the judgment without examination of prejudice. (People v. Woodward, supra, at pp. 381-382.)
>
> However, the denial of a defendant's right to a public trial " 'requires some affirmative act by the trial court meant to exclude persons from the courtroom.' [Citation.] Accordingly, a defendant's right to a public trial is only implicated by a 'closure .' "(United States v. Shryock (9th Cir.2003) 342 F.3d 948, 974 .)
>
> Bunn claims the record shows an affirmative act by the trial court to exclude persons from the courtroom, and thus a closure, because there were additional seats in the courtroom that were blocked off and the trial court affirmatively refused to make them available even though it "appreciated there [was] not enough room for everybody who wants to be here." We disagree with Bunn's reading of the record.

---

[3] The Sixth Amendment of the United States Constitution provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." Article I, section 15 of the California Constitution provides, in pertinent part, that "[t]he defendant in a criminal cause has the right to a speedy public trial . . . ."

The record shows this trial of four defendants with three juries required the use of a large part of the space in the assigned courtroom. Not counting the unknown number of seats blocked off for a buffer, there were only eight seats remaining for the public and defendants' families and friends. On one day, two of the seats were used by Torres's father and a victim services person, leaving only six seats. Counsel for several of the defendants, including Bunn, anticipated that this would be inadequate for the number of people who wanted to attend. Indeed, the trial court acknowledged the probability that not everyone who wanted to attend would be able to do so. This probability alone did not violate the right to public trial.

"[S]ince courtrooms have limited capacity, there may be occasions when not every person who wishes to attend can be accommodated. In such situations, reasonable restrictions on general access are traditionally imposed." (Richmond Newspapers v. Virginia (1980) 448 U.S. 555, 581, fn. 18 [65 L.Ed.2d 973, 993].) The constitutional right to a public trial does not require the trial to be held in place large enough to accommodate all those who desire to attend. (United States v. Kobli (3d Cir.1949) 172 F.2d 919, 923; United States v. Shryock, supra, 342 F.3d at p. 974.)

Of course, "all courts have held that an accused is at the very least entitled to have his friends, relatives and counsel present[.]" (In re Oliver (1948) 333 U.S. 257, 271-272.) Nothing in In re Oliver suggests, however, that defendants have a right to have an unlimited number of friends and relatives attend their trial when there is insufficient room. The record here shows counsel feared there would not be enough room and that more family members and friends had expressed interest in attending than there were seats available. But nothing in the record shows that members of defendant's family and/or friends actually showed up for the trial and were turned away because of lack of seats in the courtroom. Bunn points us to nothing in the record that shows family and friends came to the courtroom, could not be accommodated by the available six to eight seats, that the problem was raised before the trial court, and that the trial court then refused to allow them to sit in the buffer seats, to put up additional folding seats, to allow them to stand in the back of the courtroom, or to make some other accommodation. Nothing in the record shows the anticipated problem ever became an actual problem resulting in the exclusion of any individual from the courtroom.[4] Bunn has not shown any

[4] State v. Torres (R.I.2004) 844 A.2d 155 and Watters v. State (Md.1992) 612 A.2d 1288, relied on heavily by Bunn on appeal, are distinguishable from this case as they both involved actual exclusion of defendant's family members. (State v. Barkmeyer (R.I.2008) 949 A.2d 984, 1002-1003 [distinguishing State v. Torres – defendant's Sixth Amendment challenge requires a showing that someone was, in fact, excluded from the trial].) Here, we find there was no closure of the courtroom to family or others.

violation of his right to a public trial.

(Opinion at 11-16.)

Petitioner raised his public trial claim again in a later petition for writ of habeas corpus filed in the California Superior Court. (Resp't's Lod. Doc. 9.) Attached to that petition were four declarations from petitioner's friends and family members, who stated that they wanted to attend petitioner's trial but were prevented from entering the courtroom by the bailiff. (Id., Exs. B - E.) Specifically, petitioner's half-sister declared that although "a large group" of petitioner's friends and family wanted to attend the trial, they were told by the bailiff that "the courtroom could only accommodate two people per defendant." (Id., Ex. B.) The bailiff informed the group that it was up to them to reach an agreement as to which two persons would be allowed to attend. (Id.) The declarant and petitioner's father were chosen by the group to attend the trial. (Id.) When the declarant was in the courtroom, she noticed that the two front rows of seats were empty, but were "blocked off so that no one could sit in them." (Id.) At times, she noticed that "people who seemed to be attorneys or investigators were permitted to enter the courtroom and sit in the rows that were blocked off to members of the public." (Id.) She was told that one or two of the back rows were reserved for friends and family of the victim, but she noticed that those seats were frequently empty. (Id.) On several occasions when members of petitioner's support group approached the courtroom, she observed the bailiff turning them away. (Id.)

In another declaration, petitioner's step-mother states that because of the two-person-per-family limit she was only able to attend the sentencing proceedings, even though she wanted to attend the entire trial. (Id., Ex. C.) On several occasions when she "entered the vestibule of Department 61," the bailiff approached her and told her she could not come in. (Id.)

In another declaration, a friend of petitioner's states that she heard the bailiff tell petitioner's friends and supporters that "there was not enough room for everyone, and that only the immediate family members could attend the trial." (Id., Ex. D.) She stated that "some mornings" when the courtroom opened she would get up and start walking into the courtroom

but the bailiff turned her away. (Id.) She was "allowed to attend only two sessions of the trial," even though she wanted to attend more. (Id.) She declares that while sitting in the hallway, she observed the bailiff preventing people from entering the courtroom. (Id.)

Another friend of petitioner's declares that she was only allowed to attend several segments of the trial, including the day that petitioner testified. (Id., Ex. E.) The rest of the time she sat outside in the hallway. (Id.) She was also told by the bailiff that there was not enough seating in the courtroom for all of the persons who wished to attend. (Id.) She observed other people being turned away by the bailiff when they approached the courtroom. (Id.)

Notwithstanding these additional declarations filed by petitioner in support of his habeas petition, the California Superior Court denied petitioner's claim that the trial court violated his right to a public trial, both on procedural grounds and on the merits. In its decision on the merits of petitioner's claim, the Superior Court reasoned as follows:

> A petitioner seeking relief by way of habeas corpus has the burden of stating a prima facie case. (In re Bower (1985) 38 Cal.3d 865, 872.) A petition for writ of habeas corpus should attach as exhibits all reasonably available documentary evidence or affidavits supporting the claim. (People v. Duball (1995) 9 Cal.4th 464, 474.) A defendant has a Sixth Amendment right to a public trial, including the presence of "friendly and sympathetic spectators." (People v. Holloway (2004) 33 Cal.4th 96, 148.) A defendant's state right is co-extensive with the federal right. (People v. Bui (2010) 183 Cal.App.4th 675, 680.) However, "since courtrooms have limited capacity, there may be occasions when not every person who wishes to attend can be accommodated. In such situations, reasonable restrictions on general access are traditionally imposed." (Richmond Newspapers v. Virginia (1980) 448 U.S. 555, 581, fn. 18.) Similarly, it has been stated that "the public-trial guarantee is not violated if an individual member of the public cannot gain admittance to the courtroom because there are no available seats." (Estes v. Texas (1965) 381 U.S. 532, 588 (conc. opn. of Harlan, J.).)
>
> Petitioner alleges that he was denied the right to a public trial when, as a result of lack of space in the courtroom, only two members of his family were consistently able to be present during his trial. Petitioner raised this issue on appeal. His claim was rejected on the basis that he was not entitled to have an unlimited number of friends and relatives attend the trial when there was insufficient space. The Court of Appeal noted that in addition,

> there was no showing that friends and family were actually excluded from the courtroom. Petitioner now claims that other friends and family were in fact deprived of the opportunity to attend and attaches several declarations from friends and family stating that they attempted to enter the courtroom, but were denied access by the bailiff. First, the Court of Appeal decision did not indicate that Petitioner's demonstration of actual closure of the courtroom to some *additional* friends or family members would have constituted a violation of his right to a public trial. To the contrary, Petitioner was not entitled to an *unlimited* number of supporters. According to the petition and attachments, a minimum of two of Petitioner's friends and family were always permitted to attend the trial, with more admitted when space allowed. Given the space limitations and the fact that Petitioner always had the support of at least two family members, the fact that additional friends and family were at times denied seating in the courtroom does not show that Petitioner's right to a public trial was violated.

(Resp't's Lod. Doc. 9 at consecutive pgs. 2-3.)

Both petitioner and respondent agree that the decision of the California Superior Court on petitioner's claim of a denial of the right to a public trial is the operative decision for purposes of AEDPA review of this claim. (Doc. No. 37 at 34; Doc. No. 38 at 23 & n.7.) The prior decision of the California Court of Appeal is also instructive in this regard because the Superior Court relied heavily on that decision in reaching its own determination. See Taylor v. Maddox, 366 F.3d 992, 999 n.5 (9th Cir. 2004) ("We analyze the court of appeal's decision as the relevant state-court determination because the state supreme court denied Taylor's petition for review without citation or comment . . . However, because the court of appeal adopted the reasoning of the trial court, we also discuss the trial court's decision.").

Petitioner argues that the Superior Court's decision is based on an unreasonable determination of the facts of this case to the extent that it suggests petitioner's friends and family members were admitted to the courtroom if space allowed. (Traverse at 6-7.) He argues that, on the contrary, the record establishes that there "was *at all times* additional seating available in the courtroom, but that petitioner's friends and family were not permitted to sit in these seats." (Id. at 7.) Petitioner further argues that the Superior Court's decision is an unreasonable application of clearly established federal law because "no United States Supreme Court precedent supports

the view that a trial court may, without justification, limit to two the number of a defendant's family members who may attend a trial *when there are additional empty seats available in the courtroom*." (Id. at 9.) Petitioner argues he is entitled to de novo review of this claim "because the superior court's order, to the extent it suggests that a trial court may block off rows of seats in a small courtroom without any stated reason and thereby prevent all but two of a defendant's friends and family members from attending his trial, is an unreasonable application of clearly established federal law." (Id. at 10.)

In a supplemental brief, petitioner adds that the Superior Court's decision was an unreasonable application of federal law because the Superior Court denied a claim that petitioner never presented: whether petitioner's right to a fair trial was violated by the trial court's failure to allow an "unlimited" number of his friends and relatives to attend the trial. (Doc. No. 37 at 34-36, 38.) Petitioner asserts that the Superior Court failed to address his actual claim: that his trial was not open "to the public" in a general sense. (Doc. No. 37 at 34-36, 38.) He argues that simply because two members of his family were allowed to attend the trial does not establish that his trial was "open to the public," nor did that fact "vindicate all the concerns underlying the 'public trial' guarantee." (Id. at 35-36.) Petitioner also argues that the trial court should have allowed additional members of the public to sit in the empty seats in the courtroom. (Id. at 37.) He claims, "the record is undisputed that there were *numerous empty seats* that were reserved as an unexplained "buffer" zone that could have been used by members of the public, who repeatedly attempted unsuccessfully to attend [petitioner's] trial." (Id. at 38.)

The Sixth Amendment to the Constitution establishes that a criminal defendant has a right to a public trial, by an impartial jury. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ."). "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions."

Waller v. Georgia, 467 U.S. 39, 46 (1984) (quotations omitted). "The public-trial guarantee embodies a view of human nature, true as a general rule, that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings." Estes v. Texas, 381 U.S. 532, 588 (1965) (Harlan, J., concurring). The Court of Appeals for the Ninth Circuit has observed that "[t]he public and whatever press have any interest, including newspapers, freelance writers, bloggers and anyone else, ought generally to be able to see what is going on in courtrooms, including sentencing hearings." United States v. Biagon, 510 F.3d 844, 850 (9th Cir. 2007) (Kleinfeld, J., concurring).

One court has observed that "the precise contours of an accused's Sixth Amendment right to a public trial . . . are ill-defined." United States v. Flanders, 845 F.Supp.2d 1298, 1301 (S.D. Fla. 2012). However, the right to a public trial entitles a criminal defendant "at the very least . . . to have his friends, relatives and counsel present, no matter with what offense he may be charged." United States v. Rivera, 682 F.3d 1223, 1229 (9th Cir. 2012) (quoting In re Oliver, 333 U.S. 257, 272 (1948)). Indeed, the exclusion of a defendant's relatives "implicates Sixth Amendment values more directly than the exclusion of the general public." Id. at 1232.

"[T]he denial of a defendant's Sixth Amendment right to a public trial requires some affirmative act by the trial court meant to exclude persons from the courtroom." United States v. Shryock, 342 F.3d 948, 974 (9th Cir. 2003) (quoting United States v. Al Smadi, 15 F.3d 153, 155 (10th Cir. 1994)). Thus, a defendant's right to a public trial "is only implicated by a closure of a courtroom." Id. Closure can be justified only by an overriding interest, "such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." Waller, 467 U.S. at 46. Where a trial court closes the courtroom, it must comply with the following four requirements:

> the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

Id. at 48 (citing Press–Enterprise Co. v. Superior Court of California, 464 U.S. 501 (1984)). See also Presley v. Georgia, 558 U.S. 209 (2010) (closure of courtroom to lone member of the public who tried to attend jury selection violated right to public trial where trial court did not "consider all reasonable alternatives to the closure"); United States v. Withers, 638 F.3d 1055, 1063 (9th Cir. 2011) ("A district court violates a defendant's right to a public trial when it totally closes the courtroom to the public, for a non-trivial duration, without first complying with the four requirements established by the Supreme Court's Press–Enterprise and Waller decisions").

The Waller framework, described above, applies only to "total" closures of the courtroom - i.e., where "*all* persons other than witnesses, court personnel, the parties and their lawyers [a]re excluded for the duration of the hearing." Rivera, 682 F.3d at 1236. In cases of "partial closure" of the courtroom; i.e., where courtroom access is restricted but some members of the public are permitted to attend, some Circuit courts, including the Ninth Circuit, have held that a "substantial" interest, rather than a "compelling" interest, will justify the closure. See e.g., United States v. Sherlock, 962 F.2d 1349, 1357 (9th Cir. 1989) (no violation of defendant's right to a public trial where trial court excluded defendants' family members during one witness's testimony, because partial closure was justified to protect young victim of sex crimes from trauma and embarrassment); Bucci v. United States, 662 F.3d 18, 24 & n.3 (1st Cir. 2011) (citing cases). However, the United States Supreme Court has not adopted this standard, or even addressed "partial closures" of a courtroom.[5]

The United States Supreme Court has observed that the First Amendment rights of the public and press to attend a criminal trial are not "absolute."

> Just as a government may impose reasonable time, place, and manner restrictions upon the use of its streets in the interest of such objectives as the free flow of traffic, see, e. g., Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), so may a trial judge, in the interest of the fair administration of

[5] Courtroom closures that are deemed "trivial" do not violate the Sixth Amendment. See United States v. Rivera, 682 F.3d 1223, 1229 (9th Cir. 2012).

> justice, impose reasonable limitations on access to a trial. "[T]he question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge . . . the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places." Id., at 574, 61 S.Ct., at 765. It is far more important that trials be conducted in a quiet and orderly setting than it is to preserve that atmosphere on city streets. Compare, e. g., Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949), with Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), and Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). Moreover, since courtrooms have limited capacity, there may be occasions when not every person who wishes to attend can be accommodated. In such situations, reasonable restrictions on general access are traditionally imposed, including preferential seating for media representatives (citations omitted).

Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 581 n.18 (1980). That being said, the instances where courtroom closure will be warranted are "rare" and "the balance of interests must be struck with special care." Waller, 467 U.S. at 45. The Supreme Court has made it clear that there is a "presumption of openness." Press–Enterprise, 464 U.S. at 510.

A violation of the right to a public trial is a structural error that is not subject to harmless-error review. See, e.g., Johnson v. United States, 520 U.S. 461, 468–69 (1997); Waller, 467 U.S. at 49–50. This is because "the benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance." Waller, 467 U.S. at 49 & n.9.

This court concludes that petitioner is not entitled to habeas relief under AEDPA review on his claim that the trial court violated his right to a public trial when it limited the available seating for his family and friends. Here, unlike the situation in Waller, Richmond Newspapers, Inc., and Press-Enterprise Co., petitioner's courtroom was never completely closed to the public, either permanently or for a limited time. The cases cited by petitioner in support of this claim which involve total courtroom closures are not dispositive. See State of Rhode Island v. Torres, 844 A.2d 155 (R.I. 2004) (petitioner's right to a public trial violated where trial judge excluded all members of family, and possibly the only members of the public who sought access to the trial, from jury voir dire where empty seats were left vacant); Watters v. State of Maryland, 612

A.2d 1288 (Md. 1992) (petitioner's right to a public trial violated where trial court excluded members of defendant's family as well as the press and public from voir dire and jury selection where empty seats were left vacant). In this case, the trial court imposed a limit on the number of spectators who could be present on behalf of each defendant, rather than imposing a total closure of the courtroom to a certain segment of the public. Petitioner himself characterizes the trial court's actions as a "partial" closure. (Pet. at 18.)

No United States Supreme Court case holds that a defendant's right to a public trial is violated by less than a total closure of the courtroom. See Sherlock, 962 F.2d at 1356 ("Waller addressed *total* closure of a suppression hearing and does not necessarily govern partial closures") (italics in original); Garcia v. Bertsch, 470 F.3d 748, 754 (8th Cir. 2006) (same). Because there is no controlling United States Supreme Court case addressing partial closures of a courtroom, which is what the trial judge imposed in this case, this court cannot find that the California courts' rejection of petitioner's public trial claim was contrary to or an unreasonable application of clearly established federal law. Although the Ninth Circuit has imposed requirements for ordering a partial trial closure, circuit precedent may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme Court] has not announced." Marshall v. Rodgers, ___ U.S. ___, 133 S.Ct. 1446, 1450 (2013). See also Knowles v. Mirzayance, 556 U.S. 111, 122 (2009) ("this Court has held on numerous occasions that it is not "'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."); Carey v. Musladin, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from this Court regarding the [issue in dispute,] ... the state court's decision was not contrary to or an unreasonable application of clearly established federal law"); Holley v. Yarborough, 568 F.3d 1091, 1097-98 (9th Cir. 2009) ("Circuit precedent may not serve to create established federal law on an issue the Supreme Court has not yet addressed."); Moses v. Payne, 555 F.3d 742, 760 (9th Cir. 2009) ("In the absence of a Supreme Court decision that 'squarely

addresses the issue' in the case before the state court, . . . or establishes an applicable general principle that 'clearly extends' to the case before us to the extent required by the Supreme Court in its recent decisions . . ., we cannot conclude that a state court's adjudication of that issue resulted in a decision contrary to, or an unreasonable application of, clearly established Supreme Court precedent."); Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004) ("If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law.") (citation omitted). Because there was no "closure" of the courtroom, as that term is defined in the United States Supreme Court cases addressing this issue, petitioner's claim based on a denial of his Sixth Amendment right to a public trial must be denied. See Garcia, 470 F.3d at 752–54 ("The Supreme Court has not spoken on the partial closure issue, and the Court's closest case, Waller, is distinguishable on its facts. Our belief that the issue may have been decided differently in our court or in another circuit court is not grounds for granting habeas relief."); Angiano v. Scribner, 366 Fed.Appx. 726 (9th Cir. 2010) (habeas relief on claim of violation of right to public trial denied because "[t]he Circuits are split as to the applicability of the four-part test in Waller to 'partial closures' and "on federal habeas review, relief is not available based on conflicting interpretations of circuit precedent."); Wells v. Hartley, No. CV 07–1406 CAS (FMO), 2011 WL 7111822, *12 (C.D.Cal. Dec.19, 2011) ("[T]he Supreme Court has never addressed the situation that occurred here, i.e., a partial closure of portions of petitioner's preliminary hearing . . . Accordingly, the California Court of Appeal's rejection of [the Sixth Amendment claim] cannot be contrary to, or an unreasonable application of, clearly established federal law." (internal citations omitted)); Alarcia v. Remington, No. SA CV 10–447–PSG (SH), 2010 WL 3766337, *8 (C.D.Cal. Sept. 10, 2010) ("Since there is no controlling United States Supreme Court case for partial closures, the Court is unable to find that the California courts' rejection of petitioner's claim was contrary to or involved an unreasonable application of clearly established law, as determined by the United

States Supreme Court;" Young v. Dickhaut, No. 10-10820-DPW, 2012 WL 3638824, *9 (D.Mass. Aug. 22, 2012) ("Young contends that the state court's ruling was contrary to, and involved an unreasonable application of, Waller. However, Waller concerned the complete closure of a courtroom and not the exclusion of individual spectators. . . . Because there is no clearly established federal law with respect to partial closures, I cannot find that the state court's ruling warrants habeas relief under AEDPA"); Patton v. United States, No. CR 2-93, CV 10-19, 2010 WL 3191887, *3 (W.D.Pa. Aug. 11, 2010) ("Thus, it is important to note that courts remain split regarding how and whether courts are required to justify or consider alternatives to such closures).

Petitioner argues that the Waller test should be expanded to include circumstances involving partial closures of a courtroom. He explains, "[w]hile the Supreme Court has never applied the Waller factors in the context of a partial closure of the courtroom, Waller's second and fourth mandates logically apply in the context of members of the public, particularly a defendant's friends and family members, being prevented from occupying *empty* seats in the courtroom." (Traverse at 9.) Petitioner further argues, "it is objectively unreasonable not to extend Waller's second and fourth requirements – necessity and findings adequate to support the closure – to the context in which members of the public are prevented from attending a trial because entire rows of seats in a courtroom are blocked off as a "buffer." (Id.) While petitioner's argument may have merit, this court will not extend the reasoning of Waller in this context where the United States Supreme Court has not yet done so. See Young, 2012 WL 3638824, *10 (declining to extend the Waller rule to partial courtroom closures in the context of AEDPA review of petitioner's claim).

As set forth above, petitioner also argues that he is entitled to de novo review of this claim. Specifically, he argues that the Superior Court's decision is based on an unreasonable determination of the facts of this case to the extent that it suggests petitioner's friends and family members were admitted to the courtroom if space allowed. (Traverse at 6-7.) Petitioner points

out that there were always empty seats in the courtroom, even while his supporters were sitting out in the hall, unable to enter. (Id.) This court disagrees that petitioner's claim should be decided under de novo review because of this suggestion by the Superior Court. Regardless of whether overflow spectators were admitted to the courtroom to fill empty seats, the operative fact with respect to the Superior Court's opinion is that there was no "closure" of the courtroom because some of petitioner's supporters were allowed to attend the trial at all times. The Superior Court's decision on petitioner's public trial claim was not "based on" an unreasonable determination of the facts because whether or not spectators were allowed to fill empty seats as they became available was irrelevant to the Superior Court's pivotal conclusion that there was no "closure" of the courtroom. See 28 U.S.C. § 2254(d)(2). The Superior Court's decision denying petitioner's Sixth Amendment claim on the grounds that the courtroom was not closed to the public is, therefore, not based on an unreasonable determination of the facts of this case.

Petitioner also argues that he is entitled to de novo review of this case because the Superior Court's decision is an unreasonable application of clearly established federal law. Specifically, he contends that "no United States Supreme Court precedent supports the view that a trial court may, without justification, limit to two the number of a defendant's family members who may attend a trial *when there are additional empty seats available in the courtroom*." (Id. at 9.) This court disagrees that petitioner is entitled to de novo review of his public trial claim on this basis. For the reasons explained above, the state courts' conclusion that petitioner's right to a public trial was not violated by the partial closure at issue here is not based on an unreasonable application of clearly established United States Supreme Court precedent, as required by 28 U.S.C. § 2254(d)(1). Accordingly, review of this claim is appropriate under AEDPA.

For all of the foregoing reasons, petitioner is not entitled to federal habeas relief on his claim that the trial court violated his right to a public trial.

////

////

B. Ineffective Assistance of Counsel

Petitioner raises three claims of ineffective assistance of trial counsel. After setting forth the applicable legal principles, the court will evaluate these claims in turn below.

1. Applicable Law

The clearly established federal law for ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668 (1984). To succeed on a Strickland claim, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense." Id. at 687. Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." Id. at 687–88 (internal quotation marks omitted). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" Strickland, 466 U.S. at 687.

A reviewing court is required to make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 669; see Richter, 131 S.Ct. at 789. Reviewing courts must also "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. This presumption of reasonableness means that the court must "give the attorneys the benefit of the doubt," and must also "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did." Cullen v. Pinholster, 563 U.S. 170, 196 (2011) (internal quotation marks and alterations omitted).

Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. "The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 111. A reviewing court "need not determine whether counsel's performance

was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Strickland, 466 U.S. at 697.

Under AEDPA, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Richter, 562 U.S. at 101. "[B]ecause the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Knowles, 556 U.S. at 123.

2. Failure to Object More Forcefully to Partial Closure of Courtroom

Petitioner claims that his trial counsel rendered ineffective assistance in failing to "set forth any additional facts in support of his objection to the partial closure of the courtroom during the trial." (Pet. at 7.) He argues, "if [trial counsel] was aware of such facts, there was no valid tactical reason for failing to put them on the record, both to obtain a favorable ruling and to preserve the issue for appeal." (Id.)

Petitioner raised this claim for the first time in his petition for writ of habeas corpus filed in the California Superior Court. (Resp't's Lod. Doc. 9.) The Superior Court denied the claim, reasoning in pertinent part as follows:

> Petitioner claims that trial counsel was ineffective for failing to set forth the facts to support the claim that Petitioner's right to a public trial was violated. He suggests that counsel should have presented evidence that Petitioner's friends and family were actually being denied entry into the courtroom during trial. First, there is no indication that trial counsel was ever aware of this information. Particularly, the petition states that "if" counsel had been aware of the facts, there was no valid reason for not putting those facts in the record. However, there is no evidence that any person, including Petitioner, ever relayed those facts to counsel. Moreover, even if counsel had been aware of the facts and had presented them to the trial court, Petitioner has not shown that there is a reasonable probability the outcome would have been different. As discussed above, the fact that additional friends and family were not able to attend the trial due to space limitations does not necessarily show that Petitioner's rights were denied. Consequently, petitioner has not shown that he is entitled to relief.

Id.

In his claim as presented in the petition before this court, petitioner does not specify what additional facts his trial counsel should have presented to the trial court in support of an objection to the partial closure of the courtroom. His vague allegation that his trial counsel should have presented additional unspecified "facts" to the extent he was "aware of such facts," is too conclusory to demonstrate entitlement to relief. See Jones v. Gomez, 66 F.3d 199, 204 (9th Cir. 1995) ("'[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief'") (quoting James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994)).

Assuming arguendo that petitioner is referring to evidence that his friends and family members were actually being denied access to the courtroom during the trial, petitioner has failed to demonstrate prejudice. All of the defense counsel objected to the partial closure of the courtroom and advised the trial judge that there were many more people who wished to attend the trial than there were seats available in the courtroom. The trial judge specifically acknowledged that there would be some people who would not be allowed to attend the trial. He stated that he was unwilling to continue the trial date, and he specifically noted that all of the other courtrooms to which petitioner's trial might have been moved were not then available. (Reporter's Transcript on Appeal (RT) at 28.) Because the trial judge already knew that some of the defendants' supporters would not be able to attend the trial but was still unwilling to change the location of the courtroom or grant a continuance, any further argument by petitioner's trial counsel regarding the people that wished to attend the trial but couldn't, would not have resulted in a different ruling on counsel's objection to the partial closure of the courtroom. The trial judge's ruling limiting the available seats already took into account that a number of interested people would be prevented from entering the courtroom. Accordingly, because petitioner has failed to demonstrate prejudice, he is not entitled to federal habeas relief on this claim.

3. Failure to Move for Severance

In his next claim for relief, petitioner argues that his trial counsel rendered ineffective assistance in failing to seek severance of his trial from that of co-defendant Minor. (Pet. at 7.)

Petitioner notes that it was clear from his and Minor's pretrial statements that they each blamed the other for the shooting, and he argues that his trial counsel "should have realized that Minor's and petitioner's mutually antagonistic defenses furnished meritorious grounds for severance." (Id.) Petitioner also provides evidence that his appellate counsel asked his trial counsel in writing why he failed to request severance, but trial counsel failed to respond to appellate counsel's letter. (Id.) Petitioner argues that this makes it "clear that trial counsel did not have a valid tactical basis for failing to move for severance." (Id.) Petitioner also asserts that "there is a reasonable probability that the trial court would have granted a motion to sever." (Id. at 21.)

Petitioner raised this claim on appeal. The California Court of Appeal rejected petitioner's arguments, reasoning as follows:

> Bunn claims ineffective assistance of counsel in his trial counsel's failure to move for a severance of his trial from Minor because of their antagonistic defenses. We reject his claim.
>
> "To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. [Citation.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' (Strickland v. Washington (1984) 466 U.S. 668, 694 [104 S.Ct. 2052, 2068, 80 L.Ed.2d 674].)" (People v. Scott (1997) 15 Cal.4th 1188, 1211-1212.)
>
> In evaluating a claim of ineffective assistance, we accord great deference to the tactical decisions of trial counsel. (People v. Jones (2003) 29 Cal.4th 1229, 1254.) "[W]here the record shows that counsel's omissions resulted from an informed tactical choice within the range of reasonable competence, the conviction must be affirmed." (People v. Pope (1979) 23 Cal.3d 412, 425.) When the record contains no explanation for the challenged behavior, we will reject the claim of ineffective assistance unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation. (People v. Kipp (1998) 18 Cal.4th 349, 367.)
>
> Section 1098 states a legislative preference for joint trials. They promote economy and efficiency and serve the interests of justice by avoiding inconsistent verdicts. (People v. Coffman and Marlow (2004) 34 Cal.4th 1, 40.) Joint trials are the rule, and severance the

exception. (People v. Alvarez (1996) 14 Cal.4th 155, 190.) Where the prosecution contends multiple defendants planned and committed a murder together, a "classic" case for joinder is presented. (People v. Carasi (2008) 44 Cal.4th 1263, 1297.)

A trial court may exercise its discretion to order separate trials where the defendants will present conflicting defenses (People v. Avila (2006) 38 Cal.4th 491, 574-575), but "'[a]ntagonistic defenses do not per se require severance, even if the defendants are hostile or attempt to cast the blame on each other.' [Citation.] 'Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, *and* the jury will unjustifiably infer that this conflict *alone* demonstrates that both are guilty.' [Citations.]" (People v. Hardy (1992) 2 Cal.4th 86, 168, last two italics added; accord People v. Tafoya (2007) 42 Cal.4th 147, 162.) "When, however, there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance." (People v. Coffman and Marlow, supra, 34 Cal.4th at p. 41; accord, People v. Carasi, supra, 44 Cal.4th at p. 1298.)

In this case, overwhelming physical evidence (the GSR and Torres's blood found on Bunn, the location of one of the murder weapons at his feet, the discovery of Torres's necklace/cell phone/marijuana in the SUV) demonstrated Bunn's guilt. The jury would not have unjustifiably inferred from the conflict between the defenses of Bunn and Minor alone that Bunn was guilty. Under such circumstances, the trial court was not required to sever their trials and Bunn's attorney could have reasonably concluded a motion for severance would be futile. (People v. Frye (1998) 18 Cal.4th 894, 985 [not ineffective assistance to refrain from futile motions], disapproved on other grounds in People v. Doolin (2009) 45 Cal.4th 390, 421, fn. 22.)

In addition, it appears Bunn's trial counsel may have had a reasonable tactical justification for refraining from making a dubious motion for severance. Minor's defense was that Bunn and Mylove-Smith shot Torres, even though there was no physical evidence tying Mylove-Smith to the shooting. And, Minor claimed he bear-hugged Bunn to get him away from Torres's truck. Bunn had blood on his clothes, shoes, and hands and there was blood dripping onto the ground from Torres's truck, but Minor got Torres's blood only on his fingers. In closing argument, Bunn's counsel pointed out these problems with Minor's defense to the jury. He argued the physical evidence better fit Bunn's description of the events. Thus, it appears Bunn's counsel sought to use the implausibility of Minor's defense to encourage the jury to accept Bunn's version of the events. Such implausibility may have been underscored by the manner in which Minor testified. We cannot tell from a cold record Minor's demeanor on the stand, but it may

> have been that Bunn's counsel believed it was likely Minor would testify at trial and felt it would be helpful to Bunn. And if Minor decided not to testify, his pretrial statements to police pointing the finger at Bunn would not have been admissible against Bunn in a joint trial. (People v. Aranda (1965) 63 Cal.2d 518; Bruton v. United States (1968) 391 U.S. 123 [20 L.Ed.2d 476].) Bunn has not shown ineffective assistance of counsel by his attorney's failure to move for severance.

(Opinion at 16-19.)[6]

Petitioner denies that the evidence against him was "overwhelming." Rather, he argues that the totality of the evidence supported his explanation for the presence of blood on his body and clothes. (Traverse at 17-18.) He also notes that the jury deliberated for two and a half days, indicating that "the case was close." (Id. at 18.) He argues that, for these reasons, his trial counsel's failure to request severance was prejudicial. (Id. at 17-18.)

There is "no clearly established federal law requiring severance of criminal trials in state court even when the defendants assert mutually antagonistic defenses." Runningeagle v. Ryan, 686 F.3d 758, 774 (9th Cir. 2012) ( rejecting ineffective assistance of counsel claim premised on counsel's failure to join co-defendant's motion to sever). The United States Supreme Court has explicitly rejected a per se rule requiring severance where two defendants present mutually antagonistic defenses. Zafiro v. United States, 506 U.S. 534, 538–39 (1993). Similarly, the Ninth Circuit has concluded that there is no "constitutional standard binding on the states and requiring severance in cases where defendants present mutually antagonistic defenses." Collins v. Runnels, 603 F.3d 1127, 1131 (9th Cir. 2010). Because there is no clearly established federal

---

[6] Petitioner subsequently raised this claim again in a petition for review filed in the California Supreme Court, which was summarily denied. (Resp't's Lod. Doc. 8.) He raised the claim again in a petition for a writ of habeas corpus filed in the California Superior Court. (Resp't's Lod. Doc. 9.) Citing In re Waltreus, 62 Cal.2d 225 (1965), and In re Harris, 5 Cal.4th 828 (1993), the Superior Court rejected the claim on the grounds that it had already been raised and rejected on appeal. (Id.) Petitioner then raised the same claim in petitions for a writ of habeas corpus filed in the California Court of Appeal and California Supreme Court, which were also summarily denied. (Resp't's Lod. Docs. 10, 11.) Under these circumstances, the decision of the California Court of Appeal is the last reasoned decision on this claim of ineffective assistance of counsel.

law requiring severance of criminal trials in state court even when the defendants assert mutually antagonistic defenses, the state courts' decision that trial counsel was not deficient in failing to make a motion to sever is not an unreasonable application of the standard established in Strickland. Runningeagle, 686 F.3d at 774.

In any event, as explained by the California Court of Appeal, it appears that petitioner's trial counsel may have had a tactical reason for failing to request a trial severance. Specifically, he may have decided not to request severance because he intended to use the weaknesses in Minor's defense to bolster the credibility of his own version of the events. As noted above, this court must give petitioner's trial counsel "the benefit of the doubt," and must also "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as [he] did." Pinholster, 563 U.S. at 196 (quoting Strickland, 466 U.S. at 692). The state appellate court's determination that trial counsel's decision not to request a trial severance was a reasonable tactical decision is not contrary to or an objectively unreasonable application of Strickland. See Strickland, 466 U.S. at 690 (reasonable tactical decisions by trial counsel are "virtually unchallengeable."). Accordingly, petitioner is not entitled to relief on this claim.

4. Failure to Object to the Admission of Evidence

In his next ground for relief, petitioner argues that his trial counsel rendered ineffective assistance in failing to object to several questions asked of him on cross-examination. (Pet. at 19-26.) In the last reasoned decision on this claim, the California Court of Appeal provided the following factual summary:

> **Background**
>
> Minor's counsel asked Bunn during cross-examination whether in addition to marijuana, he also sold crack cocaine. Bunn said he did not. Minor's counsel then asked Bunn if he had a picture of crack cocaine on his phone. Bunn said that it was not crack cocaine, but soap. Referring to an exhibit of a photograph found on Bunn's cell phone, counsel again asked whether the picture was of crack cocaine. Bunn said again that it was not, although it looked similar. He denied knowing what crack cocaine looks like based on his sale of it. He said he knew the photo was of soap because

> he bought the soap and took the picture. There was no objection to this questioning.
>
> Subsequently, Minor's counsel asked Bunn if he knew what a "Swisser" is. Bunn replied that it is a cigar that has had the tobacco removed and replaced with marijuana. Bunn denied giving Swissers to kids. Counsel showed Bunn another photo from his cell phone that showed a small baby with a Swisser in his mouth. Bunn claimed a friend had taken the picture of the friend's baby and sent it to Bunn. Bunn kept it on his phone because he thought it was "kind of funny [.]" There was no objection to this questioning.
>
> Minor's counsel then asked Bunn about another photo on his cell phone that depicted a small girl. Bunn replied that it was his friend's niece. Bunn was over at her house and took the picture. There was no objection to the questioning.

(Opinion at 19-20.)

The California Court of Appeal rejected petitioner's claim that his trial counsel rendered ineffective assistance in failing to object to these cross-examination questions. The court reasoned as follows.

> **Analysis**
>
> Bunn claims ineffective assistance of counsel in his trial counsel's failure to object and move for exclusion of the evidence regarding his possession/sale of rock cocaine, his possession on his cell phone of a photograph of a baby with a "Swisser" in his mouth, and a photograph of a little girl. He claims the evidence was irrelevant, more prejudicial than probative, and improper character evidence.
>
> Where it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, we may do so without addressing whether counsel's performance was deficient. (Strickland v. Washington, supra, 466 U.S. at p. 697 [80 L.Ed.2d at p. 699]; In re Alvernaz (1992) 2 Cal.4th 924, 945.) We do so here. After a review of the record, including Bunn's testimony in his own defense, we conclude there is no reasonable probability the result would have been more favorable to Bunn if counsel had objected and the evidence had been excluded. The evidence against Bunn was incredibly strong and his defense, while it arguably accounted for the physical evidence, was an unlikely version of the events. No reasonable jury would have convicted Bunn on the basis of the three photos on his cell phone if it was not already convinced of his guilt based on the other evidence.

(Id. at 20-21.)

This court agrees with the California Court of Appeal that any error by petitioner's trial counsel in failing to object to the prosecutor's cross-examination questions about the three photographs was harmless. Petitioner had a reasonable explanation for all of the photographs, and the prosecutor introduced no substantive evidence of any kind to support his insinuation that petitioner sold crack cocaine or illegal drugs to children. Further, given the extent and nature of the evidence against petitioner, there is no "reasonable probability" that, but for counsel's failure to object to this line of questioning, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The decision of the California Court of Appeal on this claim of ineffective assistance of trial counsel is not contrary to or an unreasonable application of federal law. Accordingly, petitioner is not entitled to habeas relief.

C. Cruel and Unusual Punishment

In his last ground for relief, petitioner claims that his sentence of life without the possibility of parole for a crime that he committed when he was a juvenile violates the Eighth Amendment prohibition on cruel and unusual punishment. (Pet. at 8.) Petitioner notes that he had "no history of violence and no prior felony convictions or adjudications." (Id.) He also argues that the trial court improperly refused to consider his age or individual circumstances and background when imposing his sentence. (Id.)

1. State Court Opinion

In the last reasoned decision on this claim, the California Court of Appeal denied habeas relief, reasoning as follows:

> **The LWOP Sentence Imposed On Bunn and Minor Is Neither Unconstitutional Nor An Abuse Of Discretion**
>
> **Background**
>
> Because defendants were under 18 when they murdered Torres (Bunn was 17 years and 5 months old; Minor was 17 years and 8 months old), the People could not exact the ultimate penalty. Instead, the sentence was to be life without parole, unless the trial

court elected in its discretion to further mitigate the punishment by imposing a sentence of 25 years to life. (§ 190.5, subd. (b); People v. Guinn (1994) 28 Cal.App.4th 1130, 1141-1142 (Guinn).) To the extent they are relevant, the mitigating circumstances defined in section 190.3 and rule 4.423 of the California Rules of Court[7] provide guidelines for the exercise of the trial court's discretion. (Guinn, supra, at pp. 1142-1143.)

At the sentencing hearing, the trial court indicated it had read and considered the probation reports for both defendants, the letters filed on behalf of Minor, and the parties' various proposed amendments to the probation reports.

Both Bunn and Minor argued that a LWOP sentence would be cruel and unusual punishment and asked the trial court to exercise its discretion to impose a sentence of 25 years to life under section 190.5. Both emphasized their youth. Minor stressed his lack of any prior record of criminal offenses, claiming the LWOP sentence should be reserved for the "worst of the worst," which he was not. In his sentencing memorandum, Minor noted his father had been murdered when he was only four years old, he had completed 11th grade and was the father of a one-year-old daughter. He attached a number of letters of support to his sentencing memorandum that characterized Minor as a good and helpful person who had made a mistake. Bunn noted he had no other violence in his background and no other felony conviction. His probation report reflects he sustained only one prior juvenile adjudication for misdemeanor possession of a controlled substance. (Welf. & Inst.Code, § 11377, subd. (a).) Bunn argued the current trend of authority was to consider juvenile offenders less culpable due to their relative immaturity, lack of judgment, vulnerability to negative influences and outside pressure, and lack of formed character traits. Bunn claimed that in addition to these factors, this crime reflected a true lack of sophistication. The prosecutor asked the trial court to impose the presumptive LWOP sentence under section 190.5, subdivision (b), on both defendants. The prosecutor emphasized this murder was not a spontaneous rash decision, but an intentional deliberate execution for which neither Bunn nor Minor ever took responsibility. She suggested defendants have a "total disrespect for human life." The prosecutor then went through numerous factors in aggravation as listed in rule 4.421 that she claimed completely outweighed the circumstances in mitigation of youth and Minor's lack of criminal record.

The trial court began its comments on sentencing by finding no evidence of disability or cognitive impairment in either defendant. It noted their age had been taken into consideration by the statutory preclusion of the death penalty. The court then rejected the claim that a LWOP sentence was cruel and unusual, finding "that in no

[7] Further rule references are to the California Rules of Court.

comparison, whether it is objective or subjective, is this penalty grossly disproportionate so it would warrant this court striking the possibility, and precluding the consideration of a [LWOP].” It stated it had considered the nature of the offense, which it found to be an intentional killing.

The trial court then considered whether to exercise its discretion to reduce the presumptive LWOP sentence under section 190.5, subdivision (b). It specifically noted it would not consider the defendants' use of firearms in the murder because it was the basis for the sentence enhancement under section 12022.53, subdivision (d). In an abundance of caution, the trial court stated it would also not consider Bunn's juvenile adjudication and probation because it was not a violent offense. The trial court then went through each of the possible mitigating factors listed in section 190.3 and found them either inapplicable or in the case of defendants' age, that it did not warrant “mitigating punishment any further than to preclude the death penalty.” The trial court summarized the circumstances of the crime and considered the personal characteristics of the defendants. The trial court stated it could not find sufficient mitigating circumstances to warrant not imposing the LWOP sentence. The trial court sentenced both defendants to state prison for an indeterminate term of LWOP, plus a consecutive 25-years-to-life term for the firearm enhancement.

**Analysis**

On appeal both defendants claim the trial court erred in rejecting their constitutional argument for a reduced sentence under section 190.5. We disagree, as we shall explain.

A punishment violates the California Constitution “if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.” (In re Lynch (1972) 8 Cal.3d 410, 424, fn. omitted.) In applying this principle, we look to: (1) the nature of the offense and the offender; (2) a comparison with the penalty for more serious crimes in the same jurisdiction; and (3) a comparison with the punishment imposed for the same offense in different jurisdictions. (Id. at pp. 425-429.) “Defendant must overcome a ‘considerable burden’ to show the sentence is disproportionate to his level of culpability. [Citation.] Therefore, ‘[f]indings of disproportionality have occurred with exquisite rarity in the case law.’ [Citation.]” (People v. Em (2009) 171 Cal.App.4th 964, 972.)

“The Eighth Amendment [to the United States Constitution], which forbids cruel and unusual punishments, contains a ‘narrow proportionality principle’ that ‘applies to noncapital sentences.’” (Ewing v. California (2003) 538 U.S. 11, 20 [155 L.Ed.2d 108, 117].) This principle is “applicable only in the ‘exceedingly rare’

and 'extreme' case." (Lockyer v. Andrade (2003) 538 U.S. 63, 73 [155 L.Ed.2d 144, 156].)

Bunn argues his LWOP sentence is cruel and unusual punishment relying on the discussion of the United States Supreme Court in Roper v. Simmons (2005) 543 U.S. 551 [161 L.Ed.2d 1] (Roper). Roper holds the death penalty is excessive punishment when imposed on a person who was under 18 years old when the underlying crime was committed. Thompson v. Oklahoma (1988) 487 U.S. 815 [101 L.Ed.2d 702] (Thompson) earlier reached the same conclusion with respect to minors under 16 years old. Minor cites Thompson in his argument that mixes federal and state constitutional analysis with his claim of abuse of discretion.

"Roper and Thompson are death penalty cases in which the state court had upheld imposition of that penalty on a person who was a juvenile when the homicides were committed. "“'[D]eath is different.'"' (Kansas v. Marsh (2006) 548 U.S. [163], [180] [165 L.Ed.2d 429, 126 S.Ct. 2516, 2528]; see Gregg v. Georgia (1976) 428 U.S. 153, 188 [49 L.Ed.2d 859, 96 S.Ct. 290 [9]].) Roper, Thompson and other cases focus on and are replete with references to the excessiveness of the death penalty when applied to a minor. (See, e.g., Roper, supra, 543 U.S. at pp. 568, 571, 572; Thompson, supra, 487 U.S. at p. 836 (plur.opn.).) Justice O'Connor's concurring opinion in Thompson, in which she cast the fifth and decisive vote for the judgment in that case, pointed out the significance of the distinction: 'The Court has accordingly imposed a series of unique substantive and procedural restrictions designed to ensure that capital punishment is not imposed without the serious and calm reflection that ought to precede any decision of such gravity and finality.' (Thompson, at p. 856.) [¶] The high court's focus on the distinction between execution and lesser sanctions also is shown in passages from Atkins v. Virginia (2002) 536 U.S. 304, 306 [153 L.Ed.2d 335, 122 S.Ct. 2242], in which the court held that the death penalty cannot be imposed on mentally retarded persons. The court recognized that mentally retarded persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes, and while capital punishment is inappropriate for such persons, '[t]heir deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.' (Id. at p. 318.)" (People v. Demirdjian (2006) 144 Cal.App.4th 10, 14-15 (Demirdjian).)

Like the court in Demirdjian, we reject the claim that United States Supreme Court authority requires a conclusion that an LWOP sentence for a 17-year-old juvenile who commits a special circumstance murder is cruel and unusual punishment under the federal Constitution. (Demirdjian, supra, 144 Cal.App.4th at p. 15.) We agree with Guinn, supra, 28 Cal.App.4th 1130, which upheld a sentence of life without parole in the case of a defendant

who committed an unprovoked murder at age 17: "While we agree that the punishment is very severe, the People of the State of California in enacting the provision [section 190.5] . . . made a legislative choice that some 16- and 17-year-olds, who are tried as adults, and who commit the adult crime of special circumstance murder, are presumptively to be punished with LWOP. We are unwilling to hold that such a legislative choice is necessarily too extreme, given the social reality of the many horrendous crimes, committed by increasingly vicious youthful offenders, which undoubtedly spurred the enactment." (Id. at p. 1147.)

Nor do we find defendants' sentences violate the California constitutional prohibition of cruel or unusual punishment. (Cal. Const., art. I, § 17; In re Lynch, supra, 8 Cal.3d 410, 424.)

The circumstances of the murder and defendants themselves fully justify the imposition of the LWOP sentence. The record shows Bunn knew Torres had a substantial amount of marijuana left after his sale to Bunn the previous day. Defendants arranged the meeting with Torres at Chorley Park to "purchase" the marijuana, brought two guns, but not the required money, and waited over 45 minutes for Torres to arrive. When he did, they approached him and each fatally shot him at very close range. The location of the entry wound behind Torres's ear suggests Bunn shot Torres from behind. Nineteen-year-old Torres, unarmed, was still seat-belted into the driver's seat of his truck. Defendants then robbed Torres of his drugs, necklace and phone, leaving the profusely bleeding Torres for dead. This was a cold, calculated, and intentional murder for the purposes of robbery.

Defendants were only months away from reaching the age of majority when they committed this murder. As the trial court recognized, there is nothing in the record to show that either defendant suffered from a mental disability or cognitive impairment. Defendants never took responsibility for their crime and expressed no remorse. The trial court found defendants imitated a gangster lifestyle. Contrary to Minor's claim, this case is not similar to People v. Dillon (1983) 34 Cal.3d 441, disapproved on another ground in People v. Chun (2009) 45 Cal.4th 1172, 1186 (Dillon).

In Dillon, the California Supreme Court considered an attempted raid of a marijuana field by a group of teenagers. (34 Cal.3d at pp. 451-452.) Dillon, a 17-year-old high school student, had gone with some companions to steal the marijuana. Dillon fatally shot a man who was guarding the marijuana crop. (Id. at p. 452.) Dillon testified that he panicked and shot the victim because the man was armed, because Dillon believed the guard had just shot two of his friends, and because he believed the man was about to shoot him. (Id. at pp. 482-483.) Dillon was unusually immature, intellectually and emotionally. (Id. at pp. 483, 488.) Dillon's companions all

received minor sentences in the incident, Dillon had no prior record, the jury had expressed some reluctance at finding Dillon guilty of first degree felony murder, and both the judge and the jury believed a life sentence was excessive in relation to Dillon's true culpability. (Id. at pp. 487-488.)

It is true that in this case that both defendants were juveniles. It is true Minor had no prior record of arrest or conviction. Bunn had only a misdemeanor nonviolent conviction. However, there was no evidence defendants were unusually immature; the circumstances of the crime reflect they chose their victim and planned his execution for money and marijuana. This was not "a response to a suddenly developing situation that defendant perceived as putting his life in immediate danger." (Dillon, supra, 34 Cal.3d at p. 488.) Defendants' LWOP sentences were not disproportionate to their culpability.[8] (See People v. Thongvilay (1998) 62 Cal.App.4th 71, 87-89.)

We also reject the related claim by defendants that the trial court abused its discretion in refusing to exercise its discretion under section 190.5, subdivision (b), to reduce their sentence to an indeterminate term of 25 years to life.

First, we disagree with defendants that the trial court ignored their age. The trial court was aware and discussed their age, but found section 190.5 already took that into account in precluding the death penalty. It found their age did not require any "further" mitigation of the prescribed penalty in light of the circumstances of the crime.

The record does not support the claim that the trial court considered only the factors listed in section 190.3 and not those mitigating factors listed in rule 4.423. As we described in section III, the trial court expressly went through each of the possible mitigating factors listed in section 190.3, stated it had read and considered the probation reports (which had discussed the factors in aggravation and mitigation under the applicable rules), and it stated it had read and considered the letters filed in support of Minor. The defendants argued for leniency; the prosecutor argued the factors in aggravation completely outweighed the circumstances in mitigation of youth and Minor's lack of criminal record. There is no requirement for the trial court to state on the record its consideration of each of the factors identified in the reports and argued to it.

The trial court summarized the circumstances of the crime and considered the personal characteristics of the defendants. We

[8] Defendants argue only the nature of the offense and the offender and not the two other prongs of analysis for a claim of California cruel or unusual punishment. (In re Lynch, supra, 8 Cal.3d 410, 425-429.) We will likewise limit our discussion.

> disagree with Minor that the trial court displayed any "animus inconsistent with judicial objectivity[.]" We find the court's comments about defendants' "sagging their pants" and a codefendant's willingness to bring "his mom's car home stinking of marijuana" to be part of its observations of the defendants' demeanor and its findings regarding their attitude, which is a personal characteristic relevant to an assessment of their culpability. (See Peracchi v. Superior Court (2003) 30 Cal.4th 1245, 1254 [at sentencing, trial court may consider its own impressions of matters such as the defendant's demeanor].) The trial court appropriately noted defendants' opportunities to reconsider their intention to rob and kill Torres. Instead they intentionally murdered him. Their subsequent actions reflected no remorse. The court looked for some explanation of their actions "other than they were just pure evil" and tried to look for something good in their character. Instead, it saw "Bunn [throw] Minor under the bus trying to save himself" and Minor "ready to throw Mylove-Smith under the bus." The trial court said "that's just cold." The trial court stated it could not find sufficient mitigating circumstances to warrant not imposing the LWOP sentence. The trial court did not abuse its discretion in reaching this conclusion.

(Opinion at 21-31.)

2. Applicable Law

The United States Supreme Court has held that the Eighth Amendment includes a "narrow proportionality principle" that applies to terms of imprisonment. See Harmelin v. Michigan, 501 U.S. 957, 996 (1991) (Kennedy, J., concurring). See also Taylor v. Lewis, 460 F.3d 1093, 1097 (9th Cir. 2006). However, successful challenges in federal court to the proportionality of particular sentences are "exceedingly rare." Solem v. Helm, 463 U.S. 277, 289-90 (1983). See also Ramirez v. Castro, 365 F.3d 755, 775 (9th Cir. 2004). "The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." Harmelin, 501 U.S. at 1001 (Kennedy, J., concurring) (citing Solem v. Helm). In assessing the compliance of a non-capital sentence with the proportionality principle, a reviewing court must consider "objective factors" to the extent possible. Solem, 463 U.S. at 290. Foremost among these factors are the severity of the penalty imposed and the gravity of the offense. "Comparisons

among offenses can be made in light of, among other things, the harm caused or threatened to the victim or society, the culpability of the offender, and the absolute magnitude of the crime." Taylor, 460 F.3d at 1098.[9]

The United States Supreme Court has issued several opinions on the subject of lengthy sentences imposed on juvenile defendants. In Thompson v. Oklahoma, 487 U.S. 815, 823 (1988), the Supreme Court held that the Eighth and Fourteenth Amendments prohibited the execution of a fifteen year-old defendant convicted of first degree murder. In Roper v. Simmons, 543 U.S. 551 (2005), the Supreme Court held that the Eighth and Fourteenth Amendments prohibited the execution of defendants under the age of eighteen. In Graham v. Florida, 560 U.S. 48 (2010), the Supreme Court held that the Eighth Amendment prohibits the imposition of a sentence of life without parole on a juvenile offender who did not commit homicide. In Miller v. Alabama, ___ U.S. ___, 132 S.Ct. 2455 (2012), the Supreme Court held that a mandatory sentence of life without the possibility of parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishment. The Court in Miller explained that "[m]andatory life without [the possibility of] parole for a juvenile precludes consideration" of the defendant's "chronological age and its hallmark features," the

---

[9] As noted in Taylor, the United States Supreme Court has also suggested that reviewing courts compare the sentences imposed on other criminals in the same jurisdiction, and also compare the sentences imposed for commission of the same crime in other jurisdictions. 460 F.3d at 1098 n.7. However,

> consideration of comparative factors may be unnecessary; the Solem Court "did not announce a rigid three-part test." See Harmelin, 501 U.S. at 1004, 111 S.Ct. 2680 (Kennedy, J., concurring). Rather, "intrajurisdictional and interjurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." Id. at 1004-05, 111 S.Ct. 2680; see also Rummel v. Estelle, 445 U.S. 263, 282, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980) ("Absent a constitutionally imposed uniformity inimical to traditional notions of federalism, some State will always bear the distinction of treating particular offenders more severely than any other State.").

*Id.*

defendant's "family and home environment," the "circumstances of the [underlying] homicide offense," the fact that the offender "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth," and "the possibility of rehabilitation." Id. at 2468. The Court stated that the Eighth Amendment requires "a judge or jury ... to consider [such] mitigating circumstances before imposing the harshest penalty possible for juveniles." Id. at 2475. The Miller decision applies retroactively to cases on collateral review. Montgomery v. Louisiana, ___ U.S. ___, 136 S.Ct. 718 (2016).[10]

In Montgomery, the United States Supreme Court clarified that the Miller decision "held that a juvenile convicted of a homicide offense could not be sentenced to life in prison without parole absent consideration of the juvenile's special circumstances in light of the principles and purposes of juvenile sentencing." Montgomery, 136 S.Ct. at 725. In that case, the petitioner's sentence of life without parole for a murder he committed when he was 17 years old was "automatic upon the jury's verdict." Id. at 726. Accordingly, Montgomery "had no opportunity to present mitigation evidence to justify a less severe sentence." Id. As noted by the Supreme Court, "that evidence might have included Montgomery's young age at the time of the crime; expert testimony regarding his limited capacity for foresight, self-discipline, and judgment; and his potential for rehabilitation." Id. The Supreme Court observed that "Miller required that sentencing courts consider a child's 'diminished culpability and heightened capacity for change' before condemning him or her to die in prison." *Id.* The decision in Miller also established that "a lifetime in prison is a disproportionate sentence for all but the rarest of children, those whose crimes reflect 'irreparable corruption.'" Id. Thus, "Miller requires that before sentencing a juvenile to life without parole, the sentencing judge take into account 'how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'" *Id.* at 733. Miller "requires a sentencer to consider a juvenile offender's youth and attendant

---

[10] Miller specifically declined to address "whether the Eighth Amendment requires a categorical bar on life without parole for juveniles." Miller, 132 S.Ct. at 2469.

characteristics before determining that life without parole is a proportionate sentence." Id.

3. The Parties' Arguments/Supplemental Briefing

Petitioner argues that the Miller decision, while not strictly on point because it involved a mandatory, and not a discretionary, sentence of life without parole for juveniles, at least "undermines the constitutionality" of sentences imposed under Cal. Penal Code § 190.5(b). Petitioner reasons that because § 190.5(b) contains a presumption that a sentence of life without parole should be imposed on a defendant between the ages of 16 and 18 who commits first degree special circumstance murder, it contains sufficient mandatory aspects to fall within the reasoning of Miller. (Traverse at 10.) Petitioner notes that § 190.5(b) does not require the prosecutor to make any showing at all to justify a sentence of life without parole for juvenile defendants because that sentence is presumed to be the appropriate sentence. (Id.) He contends that this presumption contained in § 190.5(b) is contrary to pronouncements in Miller that a sentencing court must consider the individual characteristics of the defendant before sentencing a juvenile to life without the possibility of parole. (Id.)

In his supplemental brief, petitioner notes that Miller holds a sentence of life without parole for juveniles should be "rare" and "uncommon" rather than "presumptive." (Doc. No. 37 at 28.) He argues that instead of requiring an individualized showing of aggravating circumstances to warrant a sentence of life without parole, Cal. Penal Code 190.5(b) is "generally mandatory." (Id. at 30.) He argues that the mandatory nature of the statute "is no more constitutionally tolerable than the mandatory LWOP statues struck down in Miller." (Id.) Finally, petitioner argues that California's statutory scheme, which allows a sentencing court to look at the aggravating and mitigating factors applicable to adult sentencing, runs counter to the holding in Miller, which indicates that youth oriented characteristics should be considered. (Id.)

Petitioner also claims that the California Court of Appeal unreasonably approved the trial court's failure to consider his young age as a factor in mitigation. (Id. at 15.) He argues that the sentencing judge's conclusion that the California legislature had already taken a minor's young

age into account in establishing "presumptive" sentences of life without parole under Cal. Penal Code §190.5(b) "absolv[ed] judges from following the mandate of Roper and other cases establishing the constitutional requirement that sentencing courts consider the age and lower moral culpability of minors before punishing them as severely as adults." (Id. at 17.) Petitioner contends that his personal circumstances, including his "youth, immaturity, undeveloped character and transitory personality traits," warranted a lesser sentence and made a sentence of life without parole "disproportionate." (Id. at 15-16.) In short, petitioner argues that the California Court of Appeal's conclusion that a sentence of life without parole was not disproportionate to petitioner's culpability was clearly erroneous and objectively unreasonable because the trial court did not consider petitioner's individual circumstances, as mandated by Roper and Miller.

Respondent, on the other hand, argues that: (1) petitioner is not entitled to habeas relief under AEDPA review on his Eighth Amendment claim because no controlling United States Supreme Court precedent prohibits the imposition of an LWOP sentence for a murder committed by a juvenile; (2) the sentencing court was not required to consider age as a mitigating factor but, in any event, it did; and (3) even if Miller is applicable to this case, AEDPA would still bar petitioner's claim because Miller proscribed only a mandatory sentence of life without parole for juveniles and the California statute allows a trial court to impose a lesser sentence than life without parole. (Doc. No. 38 at 1-17.)

Respondent also argues that Roper is not controlling because it concerned the death penalty and not a sentence of life without parole. (Id.) He further argues that, in any event, statements in Miller to the effect that a sentencing court should only "rarely" consider sentencing juveniles to LWOP are "merely dicta" and therefore not controlling for purposes of AEDPA. (Id. at 16.) See Williams, 529 U.S. at 412 ( controlling authority for purposes of AEDPA "refers to the holdings, as opposed to the dicta, of this Court's decisions").

////

4. Analysis

Petitioner's Eighth Amendment claim must be rejected for several reasons. First, petitioner's sentence does not fall within the type of "exceedingly rare" circumstance that would support a finding that his sentence violates the Eighth Amendment. Petitioner's sentence is without question an onerous penalty. However, petitioner and his co-defendant were convicted of the crime of first degree special circumstance murder. A sentence of life without parole for first degree special circumstance murder is not grossly disproportionate. Bell v. Uribe, 748 F.3d 857 (9th Cir. 2014) (sentence of life without parole properly imposed on juvenile defendant who committed first degree special circumstance murder). Because petitioner does not raise an inference of gross disproportionality, this court need not compare petitioner's sentence to the sentences of other defendants in other jurisdictions. This is not a case where "a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." Solem, 463 U.S. at 1004-05.

Second, petitioner's sentence does not directly violate any of the United States Supreme Court decisions, cited above, addressing imposition of punishment on juvenile criminal defendants. Petitioner was not sentenced to death, as were the juvenile defendants in Thompson and Roper, and he committed a homicide, unlike the defendant in Graham.

Petitioner argues that his sentence violates the holding in Miller that a mandatory sentence of life without parole may not be imposed on a juvenile defendant. In Miller, the sentencing statute under review imposed a mandatory sentence of life without parole and "preclude[d] a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it." Id. at 2467. On the contrary in this case, although Cal. Penal Code § 190.5 arguably creates a presumption that a judge will sentence a juvenile defendant to life without the possibility of parole if he commits first degree special circumstance murder, the statute also allows the trial court, in its discretion, to impose a lesser

////

sentence of twenty-five years to life.[11] In Bell, the Court of Appeals for the Ninth Circuit held that a sentence of life without the possibility of parole imposed under Cal. Penal Code 190.5(b) on a juvenile defendant did not violate the decision in Miller because § 190.5(b) affords discretion to the sentencing judge to impose a sentence of 25 years to life, and the court in that case imposed sentence after an individualized assessment of the juvenile defendant and her offense. 748 F.3d at 869. The Ninth Circuit concluded that "the California sentencing statute is not a mandatory one subject to the rule announced in Miller. Id. at 869, n.6.[12]

---

[11] The statute provides, in pertinent part:

> (b) The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances enumerated in Section 190.2 or 190.25 has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life.

[12] After the Ninth Circuit issued its decision in Bell, the California Supreme Court decided People v. Gutierrez, 58 Cal.4th 1354 (2014). In that case, the Supreme Court granted review to determine "whether a presumption in favor of a sentence of life without parole under section 190.5(b) violates the Eighth Amendment to the United States Constitution under the principles announced in Miller." Id. At 1360. The court held that Cal. Penal Code § 190.5(b), "properly construed, confers discretion on a trial court to sentence a 16- or 17-year-old juvenile convicted of special circumstance murder to life without parole or to 25 years to life, with no presumption in favor of life without parole," and that "sentences for 16– or 17–year–old juveniles who commit special circumstance murder must be selected with no presumption in favor of a sentence of life without the possibility of parole." Id. at 1354, 1360. The court also held that "Miller requires a trial court, in exercising its sentencing discretion, to consider the 'distinctive attributes of youth' and how those attributes 'diminish the penological justification for imposing the harshest sentences on juvenile offenders." Id. at 1361. The court concluded that because § 190.5(b) authorizes and requires consideration of the attributes of youth, there was "no constitutional infirmity with section 190.5(b) once it is understood not to impose a presumption in favor of life without parole." Id. The court in Gutierrez also expressed the opinion that "in light of Miller's reasoning, a sentence of life without parole under section 190.5(b) would raise serious constitutional concerns if it were imposed pursuant to a statutory presumption in favor of such punishment." Id. at 1379. Previously, in People v. Guinn, 28 Cal. App. 4th 1130, 1142 (1994), as modified (Oct. 11, 1994), the 2nd District Court of Appeal had held that under Cal. Penal Code § 190.5, there was a "generally mandatory imposition of LWOP as the punishment for a youthful special circumstance murderer" and "therefore, LWOP is the presumptive punishment for 16 or 17-year-old special-circumstance murderers." Id. at 1142. In Gutierrez, the California Supreme Court observed that "[f]or two decades, since People v. Guinn

As set forth above, petitioner argues that the sentencing court failed to take his individual characteristics, including his age, into account when imposing sentence, in violation of the Roper decision. The California Court of Appeal found that the sentencing court did consider petitioner's individual circumstances. As described by the state appellate court:

> The trial court then went through each of the possible mitigating factors listed in section 190.3 and found them either inapplicable or in the case of defendants' age, that it did not warrant "mitigating punishment any further than to preclude the death penalty." The trial court summarized the circumstances of the crime and considered the personal characteristics of the defendants. The trial court stated it could not find sufficient mitigating circumstances to warrant not imposing the LWOP sentence.

(Opinion at 24.) The Court of Appeal also noted that the sentencing judge read and considered the probation reports pertaining to each defendant and "considered the personal characteristics of the defendants." (Id. at 31.)

These findings by the state appellate court are not based on an unreasonable determination of the facts of this case. (See RT at 1287-1324.) It is true that the sentencing judge did not consider all of the factors related to youthful offenders described in Miller, such as a child's "diminished culpability and heightened capacity for change." Miller, 132 S.Ct. At 2469. However, at the sentencing proceedings, petitioner's trial counsel argued to the court that recent cases, including cases issued by United States Supreme Court, had observed that juveniles were entitled to different considerations than adults when making sentencing decisions. (Id. at 1296-99.) The court stated it understood that "the comments [petitioner's counsel] made regarding the death penalty being precluded for those who are under the age of 18 is [sic] also

---

. . ., section 190.5(b) has been construed by our Courts of Appeal and trial courts as creating a presumption in favor of life without parole as the appropriate penalty for juveniles convicted of special circumstance murder." 58 Cal.4th at 1360. The Supreme Court disapproved the Guinn holding and clarified that § 190.5(b) contained no such presumption. However, because the petitioner in Gutierrez had been sentenced prior to the decision in Miller and in accordance with the interpretation of § 190.5(b) prevailing under Gunn, the court in Gutierrez remanded for "resentencing in light of the principles set forth in Miller and this opinion." Id. at 1361.

constructed [sic] in determining whether the appropriate sentence in this case is life without possibility of parole or a 25 year to life sentence." (Id. at 1309.) The sentencing judge took several individual factors into consideration when imposing peititoner's sentence, as set forth in Cal. Penal Code § 190.3, including "defendant's character, background, history" and "mental condition." With regard to petitioner's age, the sentencing judge stated, "[w]e are dealing with people who are 16 or 17 years old, so I am going to find that age in this case is not a factor mitigating punishment any further than to preclude the death penalty." (Id. at 1314.) At another point during the proceedings, the judge noted that "had this offense taken place seven months later than it did, Mr. Bunn would have been an adult." (Id. at 1312.) It therefore appears that the trial judge did not neglect to consider petitioner's age in imposing punishment but concluded that, under the circumstances, his age did not warrant a lesser sentence than life without parole.

It is true that the sentencing court did not specifically mention other mitigating factors related to the unique circumstances of juveniles, as suggested in the Roper and Miller decisions, when imposing sentence on petitioner. However, this court does not find that fact dispositive of petitioner's Eighth Amendment claim under the circumstances of this case. Because, as in Bell, "the sentencing judge did consider both mitigating and aggravating factors under a sentencing scheme that affords discretion and leniency, there is no violation of Miller." Bell, 748 F.3d at *11. In Bell, the Ninth Circuit also specifically found that Cal. Penal Code § 190.5(b) was not a "mandatory" sentencing statute subject to the rule announced in Miller. This court is bound to follow the decision in Bell. See United States v. Gonzalez–Zotelo, 556 F.3d 736, 740–41 (9th Cir.2009) ("The district court, like this panel, was bound to follow the reasoning of [prior Ninth Circuit precedent] unless it had been effectively overruled or was clearly irreconcilable with a case from the relevant court of last resort." (internal quotation marks and brackets omitted)); Ramos v. Wipson, No. CV 13-03717-FMO (VBK), 2014 WL 3130036, at **14-15 (June 4, 2014) (rejecting petitioner's argument that his sentence of life without parole under Cal. Penal Code § 190.5 violated the Eighth Amendment because "this claim is squarely foreclosed by the

Ninth Circuit's recent decision in Bell v. Uribe, and because the sentencing judge heard argument from the parties on whether he should impose a sentence of 25 years-to-life or a sentence of life without parole and made his decision only after considering those arguments).

In order to prevail on his Eighth Amendment claim, petitioner must demonstrate that the state court decisions rejecting the claim constitute an objectively unreasonable application of United States Supreme Court authority. For the foregoing reasons, petitioner has failed to make this showing. Even though petitioner was a juvenile at the time he committed his crimes, the decision of the state courts that the Eighth Amendment does not prohibit his sentence of life without parole for first degree special circumstance murder under a state sentencing statute that does not impose a mandatory sentence of life without parole is not contrary to or an unreasonable application of the United States Supreme Court cases cited above. Accordingly, petitioner is not entitled to relief on this claim.

CONCLUSION

For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991). In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. See Rule 11, Federal Rules

////

Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

Dated: July 25, 2016

CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

DAD:8:
bunn1373.hc